**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
**Bankruptcy Judge Thomas B. McNamara**

| | |
|---|---|
| In re:<br><br>GHEBREMEDHN FSAHAYE SBAHTU,<br><br>Debtor. | Bankruptcy Case No. 22-14103 TBM<br>Chapter 7 |
| JEFFREY A. WEINMAN, Chapter 7<br>Trustee,<br><br>Plaintiff,<br><br>v.<br><br>RUTH FESHAYE,<br><br>Defendant. | Adv. Pro. No.  22-01292 TBM |

**OPINION AND ORDER AFTER TRIAL**

### I. Introduction.

Plaintiff, Jeffrey A. Weinman, as Chapter 7 Trustee (the "Chapter 7 Trustee") for the Estate of Ghebremedhn Fsahaye Sbahtu (the "Debtor"), commenced this Adversary Proceeding by filing a Complaint[1] asserting that Defendant, Ruth Feshaye (the "Defendant"), received a fraudulent Transfer of the Debtor's one-half interest in real property located at 4648 S. Flanders Way, Centennial, Colorado (the "Property"). In the Complaint, the Chapter 7 Trustee asserted six claims for relief against the Defendant seeking to avoid and recover the Transfer of the Property under the Bankruptcy Code.[2] In the First Claim for Relief, the Chapter 7 Trustee asked that the Transfer of the Property be avoided as a fraudulent transfer under Section 548(a)(1)(A) (actual fraudulent transfer) (the "First Claim"). Per the Second Claim for Relief, the Chapter 7 Trustee requested that the Transfer of the Property be avoided as a fraudulent transfer

---

[1] Docket No. 1 and Ex. 4. The Court uses the convention "Docket No. ___" to refer to documents filed in the CM/ECF system in this Adversary Proceeding: *Jeffrey A. Weinman, Chapter 7 Trustee v. Ruth Feshaye (In re Ghebredhn Fsahaye Sbathu)*, Adv. Pro. No. 22-1291 (Bankr. D. Colo.). Capitalized terms referenced in the Introduction (but not defined in the Introduction) are defined more specifically hereinafter.

[2] 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

under Section 548(a)(1)(B) (constructive fraudulent transfer) (the "Second Claim"). Through the Third Claim for Relief, the Chapter 7 Trustee asked that the Transfer of the Property be avoided as a fraudulent transfer under Section 544(a) and COLO. REV. STAT. § 38-8-105(1)(a) (actual fraudulent transfer) (the "Third Claim").  In the Fourth and Fifth Claims for Relief, the Chapter 7 Trustee demanded that the avoided Transfer be preserved and the Trustee be permitted to recover "the one-half interest in the Property" or the value of the Transfer under Sections 550 and 551 (the "Fourth and Fifth Claims"). Finally, in the Sixth Claim for Relief, the Chapter 7 Trustee asked for authorization to sell the Property (including the interests of both the bankruptcy estate and the Defendant) under Section 363(h) to obtain his damages remedy for avoiding the Transfer (the "Sixth Claim").  The Defendant filed an untimely Answer.[3]

Later, the Chapter 7 Trustee filed a Summary Judgment Motion.[4]  The Defendant failed to respond to the Summary Judgment Motion within the 14-day period established by L.B.R. 7056-1(e).  Accordingly, on an uncontested basis and premised on the Undisputed Facts and applicable law, the Court partially granted and partially denied the Summary Judgment Motion.[5]  The Court entered Judgment in favor of the Chapter 7 Trustee and against the Defendant on the First, Third, Fourth, and Fifth Claims set forth in the Complaint.[6]

With respect to the remaining two claims (the Second Claim and Sixth Claim) asserted by the Chapter 7 Trustee, such claims proceeded to trial on December 1 and 5, 2023.  At the beginning of the trial, the Court granted the Chapter 7 Trustee's oral motion to dismiss the Second Claim.  So, the Court conducted the trial only on the sole remaining claim: the Sixth Claim.  Per the Sixth Claim, the Chapter 7 Trustee sought authorization to sell both the bankruptcy estate's one-half undivided interest in the Property along with the Defendant's one-half undivided interest in the Property under Section 363(h).  The Court received extensive evidence (testimonial and documentary) on the dispute.

Since the Court already adjudicated the Summary Judgment Motion and granted Judgment on the First Claim, Third Claim, Fourth Claim, and Fifth Claim set forth in the Complaint, the Court will not reconsider such matters and instead re-confirms its previous Judgment in favor of Chapter 7 Trustee.  Because the Court already granted dismissal of the Second Claim, it is only necessary now for the Court to decide the Sixth Claim.  For the reasons set forth below, the Court grants Judgment in favor of the Defendant and against the Chapter 7 Trustee on the Sixth Claim.

---

[3]   Docket No. 12; Ex. 6.
[4]   Docket No. 20.
[5]   Docket No. 25.
[6]   Docket No. 26.

## II.     Procedural Background

### A.     The Complaint, Answer, and Trial Setting.

On November 21, 2022, the Chapter 7 Trustee filed his "Complaint" (the "Complaint") initiating this Adversary Proceeding.[7]  In the Complaint, the Chapter 7 Trustee alleged that the Debtor and the Defendant (his daughter) jointly purchased the Property in 2019 and that the Property was titled jointly in the name of the Debtor and the Defendant.  According to the Chapter 7 Trustee, the Debtor was sued.  Shortly thereafter, "the Debtor transferred his one-half interest in the Property to the Defendant . . . by Quitclaim Deed . . . ."[8]  The Chapter 7 Trustee attached to the Complaint the Quitclaim Deed, which plainly shows that the Debtor transferred his interest in the Property to the Defendant.  The Chapter 7 Trustee characterized the Quitclaim Deed as the "Transfer"[9] and the Court adopts such nomenclature.  Later, the Debtor lost the lawsuit.  Then, on October 21, 2022, the Debtor filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code, commencing Bankruptcy Case No. 22-14013 (the "Main Bankruptcy Case").  In the Complaint, the Chapter 7 Trustee asserted the six claims for relief identified above against the Defendant.

Since the Chapter 7 Trustee commenced this Adversary Proceeding, the Defendant repeatedly failed to proceed in a timely and diligent fashion.  The Chapter 7 Trustee obtained a Summons from the Court on November 21, 2022, and served the Summons on the Defendant on November 22, 2022.[10]  The Defendant was obligated to answer or otherwise respond to the Complaint by December 21, 2022.  *See* Fed. R. Civ. P. 12 and Fed. R. Bankr. P. 7012(a).  However, she failed to do so.  After the expiration of the deadline, and at the request of the Chapter 7 Trustee, the Court extended the deadline for the Defendant to answer or otherwise respond to the Complaint "through and including January 20, 2023."[11]  The Defendant again ignored the deadline.

So, the Chapter 7 Trustee filed a "Motion for Entry of Clerk's Default" (the "Motion for Entry of Default").[12]  A few days later, on February 10, 2023, the Clerk of the Bankruptcy Court entered a "Clerk's Entry of Default" (the "Entry of Default") under Fed. R. Civ. P. 55(a) and Fed. R. Bankr. P. 7055 determining that the Defendant "is in default."[13]  About nine months later, and after substantial litigation in the case, the Defendant finally filed a "Motion to Set Aside Clerk's Entry of Default,"[14] which the Court granted.[15]  So, the Defendant is no longer in default.  And, the Defendant eventually filed an untimely "Answer" denying that the Chapter 7 Trustee was entitled to the

---

[7]     Docket No. 1; Ex. 4.
[8]     Docket No. 1 at 2.
[9]     *Id.*
[10]    Docket Nos. 3 and 4.
[11]    Docket Nos. 6 and 7.
[12]    Docket No. 9.
[13]    Docket No. 10; Ex. 5.
[14]    Docket No. 72.
[15]    Docket No. 77.

requested relief and asserting certain affirmative defenses.[16]  Thereafter, the Court entered an "Order Modifying Scheduling Order and Setting Trial" (the "Modified Scheduling Order"),[17] setting the dispute for trial on December 1, 2023.[18]

## B.    The Summary Judgment Order and Discovery Issues.

A few weeks later, on August 1, 2023, the Trustee filed a "Motion for Summary Judgment on Counts One, Three, Four, Five, and Six of the Trustee's Complaint" (the "First Summary Judgment Motion").[19]  The First Summary Judgment Motion was supported by an Affidavit of the Chapter 7 Trustee and citation to various authenticated, admissible exhibits, all in compliance with L.B.R. 7056-1.

Shortly thereafter, counsel for the Chapter 7 Trustee alerted the Court about a discovery dispute between the Chapter 7 Trustee and the Defendant, utilizing the procedure set forth in L.B.R. 7026-1(d).[20]  The Chapter 7 Trustee alleged that the Defendant failed to timely comply with written discovery (requests for admission, interrogatories, and document production requests).[21]  The Chapter 7 Trustee asserted that when the Defendant finally submitted her late responses, they were insufficient. The Court issued an "Order and Notice of Hearing on Discovery Dispute" (the "Discovery Order") and set the discovery dispute for an in-person hearing to commence on August 17, 2023.[22]  The Court also ordered both the Chapter 7 Trustee and the Defendant to "file with the Court a L.B.R. 7056-1(d)(5) Report by 3:00 p.m. on August 11, 2023."[23]  The Defendant disregarded the Discovery Order by not timely filing the L.B.R. 7056-1(d)(5) report.

Later, the Defendant conceded that she had not timely responded to the Chapter 7 Trustee's Requests for Admission because she had not timely submitted an executed response.[24]  Thus, the Defendant admitted all of the Chapter 7 Trustee's Requests for Admission.[25]  Many months later (and after the trial), the Defendant filed a "Motion to Withdraw Admission under Fed. R. Civ. P. 36(b)" wherein the Defendant asked to withdraw her deemed admission to Request for Admission No. 8.[26]  The Court denied

---

[16]      Docket No. 12; Ex. 6.
[17]      Docket No. 19.
[18]      *Id.*
[19]      Docket No. 20.
[20]      Docket No. 21.
[21]      Docket No. 24 at 2 (referring to Ex. 1).
[22]      Docket No. 21.
[23]      *Id.* (emphasis in original).
[24]      Docket No. 79 at 1 ("Ms. Feshaye did not timely respond to the Trustee's RFA because of an in-office confusion."); Ex. 2 (unsigned response to Requests for Admission).
[25]      Docket No. 22-1; Ex. 1.  *See* Fed. R. Civ. P. 36 and Fed. R. Bankr. P. 7036.  Per Fed. R. Civ. P. 36(a)(3):  "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addresses to the matter and signed by the party or its attorney."
[26]      Docket No. 79.  The Defendant did not ask to withdraw her deemed admission of any of the other Requests for Admission.

4

such relief.[27]  Accordingly, all of the Chapter 7 Trustee's Requests for Admission are deemed admitted in full.

In any event, as the Court was preparing for the hearing on the discovery dispute, the Court became aware from review of the Docket that the April 15, 2023 deadline for response to the First Summary Judgment Motion had expired without any response by the Defendant.  Upon further review, the Court determined that the First Motion for Summary Judgment was, for the most part, meritorious based upon the alleged Undisputed Facts set forth in the First Summary Judgment Motion which were deemed admitted.  Accordingly, on August 16, 2023, the Court issued an "Order Granting Motion for Summary Judgment, in Part, and Vacating Hearing on Discovery Dispute" (the "Summary Judgment Order"), granting summary judgment on the First, Third, Fourth, and Fifth Claims for relief pled by the Trustee and vacating the discovery dispute hearing.[28]

On August 16, 2023, the Court also issued a Judgment (the "SJ Judgment") in favor of the Chapter 7 Trustee and against the Defendant on the First, Third, Fourth and Fifth Claims.[29]  The Court did not enter the SJ Judgment on the Second and Sixth Claims, which remained set for trial on December 1, 2023.

**D.    The Motion to Vacate and Appeal.**

After entry of the Summary Judgment Order and SJ Judgment, the Defendant filed her "Emergency Motion for Relief from Order Under Fed. R. Bankr. P. 9024" (the "Motion to Vacate SJ Judgment").[30]  Therein, the Defendant sought relief pursuant to Fed. R. Civ. P. 59(a)(1)(B) and 60(a) alleging that the Court had erred in entering the Summary Judgment Order and SJ Judgment prematurely.[31]  The Chapter 7 Trustee submitted a "Response in Opposition" (the "Opposition") to the Motion to Vacate.[32]  The Chapter 7 Trustee argued primarily that the Defendant failed to timely respond to the Summary Judgment Motion and the Court did not err because the Court did not issue the Summary Judgment Order and SJ Judgment prematurely.  The Court denied the Motion to Vacate SJ Judgment.[33]

---

[27]    Docket No. 82.

[28]    Docket No. 25; Ex. 7.

[29]    Docket No. 26.

[30]    Docket No. 27.

[31]    The Defendant suggested in the Motion to Vacate Judgment that both Fed. R. Civ. P. 59 and Fed. R. Civ. P. Rule 60 are made applicable to this proceeding by Fed. R. Bankr. P. 9024.  However, Fed. R. Civ. P. 59 is made applicable to this proceeding by Fed. R. Bankr. P. 9023, while Fed. R. Civ. P. 60 is made applicable by Fed. R. Bankr. P. 9024.

[32]    Docket No. 30.

[33]    Docket No. 36; Ex. 8.

The Defendant also appealed the Summary Judgment Order and SJ Judgment to the United States Bankruptcy Appellate Panel for the Tenth Circuit (the "BAP").[34] The BAP dismissed the Appeal on November 15, 2023.[35]

### E.   The Second Motion for Summary Judgment.

On September 25, 2023, the Chapter 7 Trustee filed a "Renewed Motion for Summary Judgment on Count Six of the Trustee's Complaint" (the "Second Summary Judgment Motion.").[36]  As the title suggested, the Chapter 7 Trustee sought summary judgment in his favor on the Sixth Claim based upon alleged undisputed facts.  The Defendant filed an untimely "Response in Opposition to Renewed Motion for Summary Judgment."[37]  Thereafter, the Court denied the Second Summary Judgment Motion because, even accepting all of the alleged undisputed facts set forth in the Second Summary Judgment Motion, the Chapter 7 Trustee had not established all of the necessary elements for the Sixth Claim under Section 363(h).[38]

### F.   The Motion to Treat Facts As Established.

Meanwhile, on November 7, 2023, the Chapter 7 Trustee filed a "Motion to Treat Facts in Renewed Motion for Summary Judgment as Established in the Case Pursuant to Rule 7056(g)" (the "Motion to Treat Facts as Established").[39]  Through the Motion to Treat Facts as Established, the Chapter 7 Trustee asked the Court to accept as established a set of sixteen (16) proposed facts alleged as undisputed facts in the Second Summary Judgment Motion.  The Defendant opposed such relief.[40]

Thereafter, on November 27, 2023, the Court entered an "Order on Motion to Treat Certain Facts as Established for Purposes of Trial" (the "Order Establishing Facts") wherein the Court granted most (but not all) of the relief requested by the Chapter 7 Trustee.[41]  More specifically, the Court deemed as established proposed Fact Nos. 1-6, 12-14 and 16.  The Court accepted proposed Fact Nos. 8 and 9 as partially established.  And, the Court declined to find established proposed Fact Nos. 7, 10, 11 and 15.

### G.   The Stipulated Facts.

In the lead-up to trial, and per the Scheduling Order, the Chapter 7 Trustee and the Defendant filed a "Joint Pretrial Statement" (the "Pretrial Statement").[42]  In the Joint Pretrial Statement, the parties stipulated to just three facts.

---

[34]   Docket No. 34.
[35]   Docket No. 56.
[36]   Docket No. 38.
[37]   Docket No. 39.
[38]   Docket No. 50.
[39]   Docket No. 45.
[40]   Docket No. 63.
[41]   Docket No. 65.
[42]   Docket No. 53.

## H.    The Trial.

The Court conducted a trial on December 1 and 5, 2023.[43]  At the beginning of the trial, the Court granted the Chapter 7 Trustee's oral motion to dismiss the Second Claim.[44]  The trial proceeded only on the Sixth Claim since all other claims were previously adjudicated through the Summary Judgment Order and SJ Judgment.  After the completion of Opening Statements, the Chapter 7 Trustee, the Defendant, and Ghebredemedhn Fsayahe Sbathu testified at the trial.  (The Defendant and Ghebredemedhn Fsayahe Sbathu testified through an interpreter: Amleset Desta.)  The Court admitted into evidence Exhibits 1-16 presented by the Chapter 7 Trustee.  The Defendant did not ask for the admission into evidence of any exhibits.  However, the Defendant filed "Defendant's Request to Take Judicial Notice of the Current Interest Rates of 30-Year and 15-Year Mortgages."[45]  The Court granted the request for judicial notice.[46]

At the conclusion of the evidence, the Court entertained fulsome Closing Arguments from counsel for both the Chapter 7 Trustee and the Defendant.[47]  Thereafter, the parties requested an opportunity to present written citations to legal authority referenced in Closing Arguments or otherwise relevant to the remaining dispute.  The Court permitted the parties to do so.  On January 3, 2023, the Chapter 7 Trustee filed a "Notice of Filing Supplemental Authorities."[48]  The same day, the Defendant presented an "Appendix of Authorities."[49]

In the interim since the trial, the Court has considered the testimony, reviewed the admitted exhibits, and analyzed the applicable law.  The dispute over the Sixth Claim is ripe for decision.

## III.    Jurisdiction and Venue.

As set forth above, the Complaint asserts a series of causes of action based on the Bankruptcy Code: Sections 363(h), 544, 548, 550, and 551.  Generally, the Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b) and (e) and 28 U.S.C § 157(b).  This is a core proceeding under § 157(b)(2)(A) (matters concerning administration of the bankruptcy estate); § 157(b)(2)(H) (proceedings to determine, avoid, or recover fraudulent conveyances); and § 157(b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  And, venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.  The Chapter 7 Trustee and the

---

[43]     Docket Nos. 77 and 78.
[44]     Docket No. 77.
[45]     Docket No. 70.
[46]     Docket No. 77.
[47]     Docket No. 78.
[48]     Docket No. 83.
[49]     Docket No. 84.

Defendant both concur that the Court generally has jurisdiction over this Adversary Proceeding and venue is proper in the Court.[50]

## IV.     Findings of Fact.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c).[51]  The findings of fact are based on the: (1) the Requests for Admission served by the Chapter 7 Trustee which have been deemed admitted; (2) the Order Establishing Facts; (3) the Pretrial Statement; and (4) the facts established at the trial through testimony and documents.

## A.     Facts Established Through Requests for Admission.

As set forth above, the Chapter 7 Trustee served Requests for Admission.[52]  The Defendant did not timely respond.  So, the Requests for Admission have been deemed admitted.  Per Fed. R. Civ. P. 36(a)(3): "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  Accordingly, the following facts (slightly reformulated to delete the phrase "Admit that" at the beginning of each Request for Admission) are admitted:

1.      The Debtor filed for bankruptcy.

2.      The Transfer was made for less than reasonably equivalent value because the Debtor had a one-half interest in the Property at the time of the Transfer, and the Debtor did not pay You anything for the Transfer.

3.      The Transfer took place less than a month after the Debtor was served with a lawsuit by American Family Mutual Insurance Company ("American Family Insurance").

4.      The Transfer caused the Debtor to become insolvent.

5.      The Transfer was made with the intent to delay, hinder, or defraud American Family Insurance.

6.      You are the Debtor's daughter.

---

[50]     Docket Nos. 1 and 12.

[51]     As required by Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, this Order states "findings of fact specially and conclusions of law separately."  *See S.E.C. v. St. Anselm Explor. Co.*, 936 F. Supp. 2d 1281, 1285 n.6 (D. Colo. 2013).  "Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be more properly characterized." *Id*.  *See also Kolbe v. Endocrine Servs., P.C.*, 2022 WL 970004, at *1 (D. Colo. Mar. 31, 2022)("To the extent that any conclusions of law are deemed to be findings of fact, they are incorporated herein by reference as findings of fact.").

[52]     Docket No. 22-1; Ex. 1 and 2.

7.     The Debtor did not disclose the Transfer on the Statement of Financial Affairs of his bankruptcy petition.

8.     The Property contained over $200,000 in equity at the time of the Transfer.

Per the Requests for Admission, the term "Property" means: "the real property located at 4648 South Flanders Way, Centennial, CO 80015."  The term "You" means "Ruth Feshaye and her agents, representatives, attorneys, predecessors and successors in interest, and all others acting on their behalf."  And the term "Transfer" means "the Quitclaim Deed executed on March 5, 2022 transferring the Debtor's interest in the Property to the Defendant."

**B.     Facts Established Pursuant to the Order Establishing Facts.**

Pursuant to the Order Establishing Facts, the Court has determined that the following facts are deemed established for trial:

1.     Debtor filed for protection under Chapter 7 of the Bankruptcy Code on October 21, 2022 ("Petition Date").

2.     On October 23, 2019, the Property was transferred from Carlos A. Adames and Veronica Adames to the Debtor and the Defendant (the "2019 Deed"); the deed transferring the property on October 23, 2019, was recorded with the Clerk and Recorder for Arapahoe County, Colorado on October 28, 2019, at Reception Number D9115946.

3.     At the time the Property was transferred into the Debtor and Defendant's names, Debtor and Defendant jointly executed a note and Deed of Trust in favor of Fairway Independent Mortgage Corporation in the sum of $419,159.00.

4.     On March 5, 2022, the Debtor transferred his one-half interest in the Property to the Defendant (the "Transfer") by Quitclaim Deed.

5.      The Quitclaim Deed documenting the Transfer was recorded with the Clerk and Recorder for Arapahoe County, Colorado on March 10, 2022, at Reception Number E2027864.

6.     On May 27, 2022, roughly three months after the Transfer, the Defendant entered into a Deed of Trust, in favor of Canvas Credit Union, in the maximum principal amount of $60,000.00.

7.     The Court entered its "Order Granting Motion for Summary Judgment, in Part, and Vacating Hearing on Discovery," dated August 16, 2023 (Docket Nos. 25), wherein the Court granted summary judgment in favor of the Trustee and against the Defendant on the First, Third, Fourth, and Fifth Claims set forth in the Complaint.

8.      The Defendant is not a public utility, because the Defendant is an individual.

9.      The Trustee served discovery requests upon the Defendant on May 17, 2023.

10.     The Defendant did not respond to those requests until July 25, 2023.

11.     The Transfer prevented a judgment lien from entering against the Property in favor of American Family Insurance.

**C.      Facts Established Through the Pretrial Statement.**

In the Pretrial Statement, the Chapter 7 Trustee and the Defendant stipulated to admission of the following facts:

1.      Ghebremedhn Fsahaye Sbahtu (the "Debtor") filed for relief under Chapter 7 of the Bankruptcy Code on October 21, 2022 (the "Petition Date

2.      Jeffrey A. Weinman (the "Trustee") is the duly appointed and acting trustee in the Debtor's bankruptcy case.

3.      The Defendant is the Debtor's daughter.

**D.      Facts Established Through Judicial Notice.**

Pursuant to the request of the Defendant, at the trial the Court took judicial notice that as of November 22, 2023: (1) the United States weekly average mortgage rate for a 30-year fixed rate mortgage is 7.29%; and (2) the United States weekly average mortgage rate for a 15-year fixed rate mortgage is 6.67%.  Such judicial notice was based on the Federal Home Loan Mortgage Corporation Primary Mortgage Market Survey available at https://fed.stlouisfed.org/series/MORTGAGE30US.

**E.      Facts Established by Evidence at Trial.**

The Court makes the following factual findings based upon the testimonial and documentary evidence presented at the trial.  To avoid duplication, the Court does not recapitulate all of the foregoing facts already established before the trial.  Also, the Court limits its factual findings only to matters relevant to the Sixth Claim.

**1.      The Defendant and Her Relationship with the Debtor.**

The Defendant, Ruth Feshaye, is a middle-aged woman who currently resides in Colorado at the Property (4648 South Flanders Way, Centennial, Colorado 80015). She is the daughter of the Debtor, Ghebremedhmn Fsahaye Sbahtu.

The Defendant was born in 1980 in Eritrea, a small African nation on the Red Sea bordered by Sudan (to the west) and Ethiopia (to the south).  She grew up in poverty.  Her native language is Tigrinya (also sometimes referred to as Tigrigna).  Although she has some knowledge of English, the Defendant testified at the trial through the use of a Tigrinya interpreter. The Defendant's formal education ended at the primary level in the fifth grade.

At 13 years old, the Defendant was forced into a marriage arranged by her father with a Eritrean man (who she did not know) living in Norway.  She moved to Norway in 1993.  She did not know anything about Norway and did not speak Norwegian.  The Defendant was abused during the marriage.  She had a son.  She spent 13 years isolated in Norway.

The Defendant left her husband and moved to Minneapolis, Minnesota with her son in 2006.  Minnesota had a large community of immigrants from locations near the Horn of Africa: Eritrea; Ethiopia; and Somalia.  She lived in Minnesota for seven years.  She supported herself working in a daycare, a group home for disabled adults unable to care for themselves, and a J.C. Penny department store.  She worked very hard to save money for her future.  She rented a place to stay.  In 2013, the Defendant moved to Seattle, Washington.  After continuing to work, she finally saved enough to buy a house in 2017.

In May 2018, the Defendant moved to Aurora, Colorado.  Although she sold her house in Seattle, Washington, she initially rented a place to stay in Aurora, Colorado.  She found work with a transportation dispatching company assisting long-haul truckers.  She also took care of children and secured another job assisting an individual with special needs on the weekends.  By this time, her father, brother and other relatives also had moved to Colorado.

2. **The Property**.

a. **The Acquisition of the Property**.

On October 23, 2019, the Defendant bought the Property (4648 South Flanders Way, Centennial, Colorado) from Carlos A. Adames and Veronica Adames (the "Sellers") for $435,000.00.[53]  The Warranty Deed (the "Warranty Deed")[54] effecting the transfer lists the "Grantees" as both the Defendant and "Ghebremedhn Sbahatu" (a slight misspelling of the name of the Defendant's father, the Debtor: "Ghebremedhn Fsayhaye Sbahtu.")  Furthermore, the Warranty Deed states that the Sellers sold the Property to the Grantees (the Defendant and the Debtor) "not in tenancy in common but in joint tenancy . . . ."[55]  The Warranty Deed was recorded with the Clerk and Recorder for Arapahoe County, Colorado, on October 28, 2019, at Reception No. D9115946.

---

[53]   Ex. 9.
[54]   *Id.*
[55]   *Id.*

Contemporaneously with the purchase of the Property, the Defendant and the Debtor also executed a Deed of Trust in favor of Fairway Independent Mortgage Corporation (the "Initial Deed of Trust").[56]  The Initial Deed of Trust listed both the Defendant and the Debtor (using the correct name: Ghebremedhn Fsayhaye Sbahtu) as "Borrower."  Although the Court did not receive the associated promissory note into evidence, the Initial Deed of Trust recites that "Borrower" (*i.e.*, both the Defendant and the Debtor) signed a promissory note in the amount of $419,159.00.  Under the Initial Deed of Trust, the Defendant and the Debtor pledged the Property as security for such promissory note.  The Initial Deed of Trust was recorded with the Clerk and Recorder for Arapahoe County, Colorado on October 28, 2019, at Reception No. D9115947.

Based upon the Warranty Deed and the Initial Deed of Trust, a loan of $419,159.00 from Fairway Independent Mortgage Corporation funded the majority of the $435,000.00 purchase price for the Property.  The remaining amount (the "Downpayment") for the Property was $15,841.00.  The Defendant made the entire Downpayment for the Property using funds derived from the sale of her house in Seattle, Washington (which itself had been purchased by the Defendant using solely funds earned by the Defendant from her employment).  Put another way, the Defendant funded the entire Downpayment on the Property and the Debtor did not contribute anything to the Downpayment.  After the purchase of the Property on October 23, 2019, the Defendant made all of the regular monthly mortgage payments on the Property to Fairway Independent Mortgage Corporation or its assigner or servicer (except for certain payments delayed because of the COVID pandemic).  The Debtor did not contribute anything toward monthly mortgage payments on the Property.

### b.   <u>The Refinance and the Transfer of the Property</u>.

On March 5, 2022, the Defendant sought to refinance the loan on the Property. The Defendant (as the sole "Borrower") executed a Deed of Trust in favor of United Wholesale Mortgage, LLC (the "Replacement Deed of Trust").[57]  Per the Replacement Deed of Trust, the Defendant alone executed a promissory note in the amount of $430,000.00 in favor of United Wholesale Mortgage, LLC.  (The Court did not receive a copy of the promissory note into evidence.)  Under the Replacement Deed of Trust, the Defendant pledged the Property as security for such promissory note.  The Replacement Deed of Trust was recorded with the Clerk and Recorder for Arapahoe County, Colorado, on March 10, 2022, at Reception No. E2027865.

As part of the refinancing transaction, the Defendant and the Debtor both executed a Quitclaim Deed, dated March 5, 2022, transferring the Property from the Defendant and the Debtor solely to the Defendant.[58]  The Quitclaim was recorded with the Clerk and Recorder for Arapahoe County, Colorado on March 10, 2022 at Reception No. E2027864 (which was immediately before the Replacement Deed of Trust).  The

---

[56]     Ex. 10.
[57]     Ex. 12.
[58]     Ex. 11.

execution of the Quitclaim Deed had the effect of extinguishing whatever legal and/or equitable interest the Debtor may have had in the Property. The Defendant has admitted that "[t]he Property contained over $200,000 in equity at the time of the Transfer." Thus, the Defendant has effectively admitted that the Property was worth at least $630,000.00 as of March 5, 2022 (*i.e.*, the amount of the debt listed in the Replacement Deed of Trust ($430,000.00) plus $200,000.00). The Debtor received no, or nominal, consideration for the Transfer.[59]

Since the refinancing of the Property on March 5, 2022, the Defendant has made all of the regular monthly mortgage payments on the Property to United Wholesale Mortgage, LLC, or its assigner or servicer. The mortgage payments are about $2,500.00 per month. The Defendant is current on her monthly mortgage payments to United Wholesale Mortgage, LLC or its assigner or servicer. However, it is quite difficult for the Defendant to earn enough to make the mortgage payments along with paying her other bills. The Debtor has not contributed anything toward monthly mortgage payments on the Property.

### c.    The Subsequent Loan on the Property.

Not long after the refinancing with the Replacement Deed of Trust, on May 27, 2022, the Defendant executed a Deed of Trust in favor of Canvas Credit Union (the "Additional Deed of Trust").[60] The Additional Deed of Trust recites that the Defendant entered into a "Credit Line Account Variable Interest Rate Home Equity Secured Open-End Credit Agreement" (the "Credit Line") with Canvas Credit Union in the "Maximum Principal Amount of $60,000.000." The Additional Deed of Trust was recorded with the Clerk and Recorder for Arapahoe County, Colorado on June 7, 2022, at Reception No. E2061938. Under the Additional Deed of Trust, the Defendant pledged the Property as security for the Credit Line. The Defendant borrowed money under the Credit Line to remodel the basement of the Property. However, after Canvas Credit Union raised interest rates on the Credit Line dramatically, the Defendant did not complete the remodel project and instead paid off the Credit Line in full (after borrowing some funds from others). As a result, Canvas Credit Union does not have a remaining lien on the Property.

### d.    Other Facts Pertaining to the Transfer of the Property.

As noted earlier, the Defendant's father, the Debtor, was listed as a "Grantee" under the Warranty Deed when the Property was acquired on October 23, 2019. But why? The Defendant testified that she "added [her] father out of respect and to honor [her] father." She further indicated that in Eritrean culture "fathers are highly respected. And, adding [my father to the Warranty Deed] honors and respects him." The Defendant appeared earnest and emotional during her testimony. Overall, the Court assesses the Defendant as credible.

---

[59]    Ex. 11, the Quitclaim Deed, recites that the Debtor received consideration in the amount of $10.00.

[60]    Ex. 13.

Notwithstanding, the cultural explanation seems a little odd.  The Court supposes that if the Defendant was trying to honor her father, she probably would tell her father that she "added" him to the title to the Property.  Otherwise, it would be some sort of secret honoring.  However, the Debtor testified emphatically (through an interpreter) that he was not told at the time the Property was acquired that he would be on the title to the Property.  He asserted that someone named "Richard" told him that he was on the title to the Property in 2021.  According to the Debtor, that was the first he ever knew about the situation.  Again, this seems quite peculiar, especially because the Debtor executed the Initial Deed of Trust (and presumably signed the accompanying promissory note which was not admitted into evidence).  So, he must have been present as part of the acquisition of the Property.

What to make of all this?  As best the Court can piece it together, the Court finds that the Defendant and the Debtor were both extremely unsophisticated in real estate matters.  Neither has much facility in English.  Both testified in the Tigrinya language.  The Defendant's education ended in the fifth grade in Eritrea.  The Court doubts that the Defendant and the Debtor were able to read and understand the Deed of Trust executed in connection with the purchase of the Property.  The Court finds it most likely that the Defendant and the Debtor both intended that the Defendant would be the person buying and owning the Property, not the Debtor.  After all, the Debtor did not contribute financially in any way.  He did not make the Downpayment, and he never made any subsequent monthly mortgage payments either.  But, notwithstanding such understanding, the Debtor was present at the closing and signed some documents (which were important, but likely not understood by him) in a sort of supportive capacity.  And, the Defendant did want to honor her father consistent with Eritrean culture.

In any event, however it happened, the Debtor was listed on the Warranty Deed and so held record title to the Property along with the Defendant until the Transfer on March 5, 2022.  What happened then?  Again, the evidence was murky.  The Debtor's explanation was that in early 2022 she wanted to buy a liquor store with her brother.  She approached a bank about a possible financing whereupon she was told that her father (the Debtor) would need to be removed from title to the Property.  (The Court received very little detail about such assertions.  Neither the bank nor the person at the bank who allegedly made the statement were identified.)  In any event, the Defendant continued by testifying that the "separate loan for $60,000.00 was not sufficient to buy the liquor store."  None of this makes a lot of sense in light of the documentary evidence.  The Defendant refinanced the Property on March 5, 2022 and executed the Replacement Deed of Trust.  That was the same day as the Quitclaim Deed was executed.  So, the Quitclaim Deed must have been executed as part of the refinancing of the Property; not as part of a potential liquor store purchase.  After all, the "separate loan for $60,000.00" occurred months later.

The Chapter 7 Trustee suggests that the March 5, 2022 Transfer was made because the Debtor was served with a lawsuit in April 2022 by American Family Insurance.  The implication is that the Debtor was trying to hide or dispose of his assets.

14

The timing is certainly very suspicious.  But, there was no evidence that the Defendant knew that the Debtor had been sued at the time of the Transfer.  Nevertheless, the Defendant has admitted (through failure to respond to the Requests for Admission) that "[t]he Transfer was made with the intent to delay, hinder, or defraud American Family Insurance Company."  Given the passive grammar of the Request for Admission (*i.e.*, "the Transfer was made with the intent" but without identifying whose intent) and the text of Section 548(a)(1)(A) (a transfer may be avoided "if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intend to hinder, delay, or defraud"), the Court finds that the Request for Admission refers to the Debtor's intent, not the Defendant's intent.  There is no evidence that the Defendant herself intended to hinder, delay, or defraud anyone when she executed the Quitclaim Deed and effected the Transfer along with the Debtor.

### e.   The Nature and Use of the Property.

The Property is a single-family residence which consists of a main level and basement.  The basement is not finished.

In terms of occupancy, the Defendant has lived at the Property continuously from October 2019 to the present (except for the period from June 2021 to November 2022 during which the Defendant temporarily moved to Dallas, Texas to work and train as a logistics dispatcher).  She receives her mail at the Property.  Much of the time, the Defendant has lived alone in the Property.  However, the Defendant's father (the Debtor), her mother, and her two siblings also lived at the Property, but only for a seven-month period from October 2019 to April 2020.  From approximately May 2020 to June 2021, the Defendant also housed a special needs adult in the Property.  The Defendant took care of the adult with special needs to make additional income.  Starting on December 2022, the Defendant also started taking care of a child with special needs.  The child does not live at the Property, but comes to the Property to be cared for on weekends.  Finally, at the end of June 2023, the Defendant's adult son also moved into the Property with the Defendant.

The Defendant relies on the Property to earn income.  She works exclusively from a home office at the Property in which she conducts her logistics dispatching business (New Oslo Logistics).  She has no other place to conduct the business.  (Given the relatively modest income derived from the business, the Court finds it unlikely that the Defendant could profitably rent external office space in which to conduct such business).  As noted above, the Defendant has also used the Property to facilitate care of individuals with special needs: an adult and a child.  The Defendant has no other location from which to perform such services.

The Defendant also has rented the Property from time to time to earn additional income.  She listed the Property as an available rental on AirBNB.  She attempted to remodel the basement so that she could stay at the Property while renting the main living level on AirBNB.  However, the basement remodel was not completed.  So, when the Defendant rents the Property, she stays temporarily with a relative.  Notwithstanding

the foregoing, the Property has been rented through AirBNB only rarely (about two to three days a month) during the last several years.

### f. <u>The Value of the Property</u>.

The Defendant did not testify concerning the value of the Property.  And, neither the Chapter 7 Trustee nor the Defendant solicited testimony from an appraiser, real estate broker, or other real property valuation expert.  However, the Court did receive some evidence of the value of the Property.

As noted above, per the Replacement Deed of Trust and Request for Admission No. 8, the Defendant has effectively admitted that the Property was worth about $630,000.00 as of March 5, 2022.

Such admission is corroborated by tax valuation.  On April 15, 2023, the Arapahoe County Tax Assessor issued a "Notice of Valuation" for the Property (the "Tax Assessment").[61]  According to the Tax Assessment, the "Current Year Actual Value as of June 30, 2022" for the Property was $609,000.00.  The "Prior Year Actual Value as of June 30, 2020" for the Property was $435,500.00  Thus, per the Tax Assessment, the value of the Property increased by $173,500.00 in the period from June 30, 2020 to June 30, 2022.  The Defendant did not appeal the Tax Assessment.  So, the Tax Assessment establishes a value of $609,000.00 for the Property just three months after the Transfer.

The Chapter 7 Trustee also testified regarding value and asserted that the value of the Property is about $600,000.00.  He based his valuation on: (1) general knowledge of real estate transactions in Colorado; (2) computerized value research on internet websites including Zillow and RedFin; (3) the Tax Assessment at $609,000.00; and (4) an analysis of bank lending practices and required equity for real estate loans as evidenced by the Replacement Deed of Trust and Additional Deed of Trust.  The Chapter 7 Trustee's testimony was not rebutted.

Based on the evidence at trial, the Court finds that the value of the Property for purposes of Section 363(h) analysis is $600,000 (as advocated by the Chapter 7 Trustee even through the Defendant admitted a slightly higher amount).  The Chapter 7 Trustee also testified, and the Court accepts as a truism, that sale of the estate's undivided interest in the Property would realize significantly less for the Debtor's bankruptcy estate than the sale of the Property free of the interests of the Defendant.  Indeed, the Trustee could not fathom anyone being interested in buying an undivided joint tenancy interest in the Property.

---

[61] Ex. 14.  Before and during the trial, the Defendant objected to the admission into evidence of the Tax Assessment for purposes of establishing value.  For the reasons explained by the Court in detail at the trial, the Court overruled the Defendant's objections and admitted the Tax Assessment.

3.      <u>**Facts Pertaining to the Benefit to the Estate if the Property Is Sold under Section 363(h).**</u>

The Chapter 7 Trustee is a fiduciary charged with "collect[ing] and reduc[ing] to money the property of the [Debtor's] estate" for the benefit of creditors and other parties in interest.  11 U.S.C. § 704(a)(1).  Only one creditor has filed a proof of claim against the Debtor's bankruptcy estate:  American Family Insurance.  In Claim No. 1-1, American Family Insurance demands $34,675.96 based upon a Transcript of Judgment against the Debtor issued on April 28, 2022 in the case captioned: *American Family Mutual Insurance Company v. Ghebremdhn Sbahtu*, Case No. 22-CV-30281 (District Court, Arapahoe County, Colorado).[62]

According to the Chapter 7 Trustee, the Court's Summary Judgment Order and the SJ Judgment confirm that the Debtor's estate is the owner of a one-half interest in the Property in joint tenancy.  The Chapter 7 Trustee testified that the Debtor's bankruptcy estate will benefit economically if the Property is sold under Section 363(h). According to the Chapter 7 Trustee (and as the Court already has found), the value of the Property is not less than $600,000.00.  To sell the Property, the Chapter 7 Trustee would have to engage a real estate broker who would charge approximately 6% of the sales price (*i.e,* about $36,000.00).  The Chapter 7 Trustee also acknowledged that there would be approximately $3,000.00 in additional closing costs for title insurance, recording fees, taxes, and the like.  And, the lien based on the Replacement Deed of Trust (estimated at the face principal amount of $430,000.00), would need to be satisfied for a closing on sale of the Property

Thus, per the Chapter 7 Trustee, any sale of the Property would net about $131,000.00 ($600,000.00 - $36,000.00 – 3,000.00 - $430,000.00 = $131,000.00). (The Chapter 7 Trustee's calculation does not account for any homestead exemption or adjustment for respective contributions.)  Since the Chapter 7 Trustee asserts entitlement to only half of the remaining proceeds, the Chapter 7 Trustee contends that he would be able to recover about $65,500.00.  Such amount would be available to pay administrative claimants (including the Chapter 7 Trustee as well as his legal counsel and accountant) with any remainder available to pay American Family Insurance, at least in part (depending on the amount of allowed administrative expense claims).  The Chapter 7 Trustee estimates that his commission would be $9,000.00 to $10,000.00, while his accountant is owed about $2,000.00 and attorneys' fees would be between $15,000.00 and $20,000.00.  Using the highest figures, administrative expenses would aggregate to about $32,000.00.  Then a surplus of $33,500.00 would be available to nearly satisfy American Family Insurance's $34,675.96 Proof of Claim.  According to the Chapter 7 Trustee, if the Chapter 7 Trustee recovers more from the sale of the Property

---

[62]      During the trial, the Chapter 7 Trustee repeatedly testified that the American Family Insurance Proof of Claim was for $26,486.00.  It is true that in his Schedule E/F (Ex. 16), the Debtor identified the "total claim" owing to American Family Insurance as $26,486.00.  However, the Chapter 7 Trustee did not testify about the amount of the Proof of Claim actually filed by American Family Insurance, which is for $34,675.96.  (Claim No. 1-1 in the Main Bankruptcy Case.)  The Court bases its calculations on the actual amount of the Proof of Claim filed by American Family Insurance.

or the estimated administrative expenses are lower, American Family Insurance could be paid in full.  Per the Chapter 7 Trustee, the foregoing is the benefit of selling the Property under Section 363(h).  The Chapter 7 Trustee also testified that the Property cannot be partitioned in kind.

### 4.   Facts Pertaining to the Detriment to the Defendant if the Property Is Sold under Section 363(h).

#### a.   The Defendant's Income and Connection to the Property.

The Defendant's main current occupation is as a dispatcher for long-haul truckers.  She started and owns a small dispatching business: New Oslo Logistics (an apparent reference to the Defendant's time spent in Norway).  The business is operated by the Debtor out of the Property.  Over the last year, she has provided regular dispatching services for four long-haul trucks.  She earns between $800.00 to $2,000.00 per month on average.  However, very recently, two of the long-haul trucks have become disabled in accidents and require repairs.  So, her foreseeable future income from the New Oslo Logistics business is likely to be less than the historical average (perhaps as much as a 50% decline in revenue).  To supplement her income, the Defendant currently takes care of a special needs person on the weekends at the Property.  She earns about $1,200.00 per month from that job.  Sometimes she earns some supplemental income from AirBNB income derived from renting the Property.  So, all of the Defendant's current income currently is tied to the Property.

#### b.   The Defendant's Ability to Obtain a New Property.

The Defendant cannot afford another comparable house if the Property is sold by the Chapter 7 Trustee in a Section 363(h) sale.  First, any new comparable home likely would be out of reach to begin with given the substantial recent increase in real property values.[63]  Second, in order to purchase any new comparable home, the Defendant likely would need to obtain a loan with a principal balance far greater that the $430,000.00 original principal balance owed to United Wholesale Mortgage, LLC, under the Replacement Deed of Trust.  But, since the Defendant struggles significantly to make the current $2,500.00 per month mortgage payments to United Wholesale Mortgage, LLC,[64] and sometimes has to resort to renting out the home to make ends meet,  the Defendant will not be able to afford a larger loan.  Third, even if the Defendant somehow was able to obtain a new house with a comparable loan size (around

---

[63]   See Ex. 14 (showing dramatic increase in real property valuation from 2020 to 2022).

[64]   Neither the Chapter 7 Trustee nor the Defendant introduced the promissory note with United Wholesale Mortgage, LLC.  Also, the Court did not receive into evidence any monthly account statements for the Defendant's mortgage.  So, the only basis for the $2,500.00 monthly mortgage payment amount is the Defendant's testimony, which was unrebutted.  Similarly, the Defendant testified that her current mortgage interest rate is 3.5%.  Again, the only evidentiary basis for the 3.5% interest rate is the Defendant's testimony, which was unrebutted.  The amounts seem a little off because, as a matter of mathematical calculation, the monthly mortgage payment due on a $430,000.00 loan at 3.5% interest likely would be less than $2,500.00.  However, given the lack of further evidence, the Court accepts the Defendant's testimony.

$430,000.00 original principal balance), the Defendant still could not afford such arrangement because of the substantial recent increase in mortgage rates.  Her loan secured by the Replacement Deed of Trust is at a 3.5% interest rate.  The current interest rates (as of the date of the trial) are more than double.  The United States weekly average mortgage rate for a 30-year fixed rate mortgage is 7.29%.  If the Property was sold and the Defendant tried to obtain a new loan in the same amount for a comparable home at the 7.29% interest rate, the Defendant could not make such payments.  And, if the Debtor were to purchase a smaller home, she would not likely be able to rent it for as much when she needed to supplement her income.

The Chapter 7 Trustee points out that if the Property is sold under Section 363(h) (and assuming that the Chapter 7 Trustee's sales and costs estimates are correct), the Defendant may be able to obtain $65,500.00 from the sale.  Possibly.  However, the Court still finds that the Defendant would not be able to obtain a comparable home under such circumstances given the increase in property values and the increase in mortgage interest rates.  At most, such amount might fund a downpayment and some of the additional costs for moving but would not be enough to offset the increase in property values and the increase in mortgage interest rates.

The Defendant asserts that she would be rendered homeless and living on the streets if the Property were sold under Section 363(h).  The Court finds such testimony appears to be an overstatement.  Instead, armed with possibly $65,000.00, the Defendant likely would be forced to find a much smaller, inferior home.  Or, more likely, the Defendant would be forced out of homeownership entirely and would have to revert to renting an apartment at rates which are similar to her current mortgage (*i.e.,* $2,500.00 per month).  So, the detrimental impact on the Defendant would be significant.

### c.    The Defendant's Inability to Exercise a Right of First Refusal.

Section 363(i) provides a non-debtor co-owner a right of first refusal if a Section 363(h) sale is authorized: "Before the consummation of a sale of property to which subsection . . . (h) of this section applies . . . the debtor's . . . co-owner of the property . . . may purchase such property at the price at which such sale is to be consummated." For the same reasons set forth above with respect to the Defendant's inability to purchase another comparable home, the Defendant also has no ability to exercise a right of first refusal to purchase the Property herself for $600,000.00 under Section 363(i). [65]

### d.    The Defendant's Attachment to the Property.

The Defendant testified credibly and convincingly that her house (the Property) "means everything."  She "works from home and lives at home."  If the Property is sold,

---

[65]    The Debtor similarly has no ability to exercise a right of first refusal to purchase the estate's interest in the Property for $534,500 (the $600,000 value of the home, minus the $65,500 value of the Defendant's interest, as  assessed by the Trustee).

she "has nowhere to go."  And, without the Property, the Defendant's income is substantially at risk.  For example, if she is forced to move to a rental apartment, she may not be able to realize income for AirBNB rentals and serving adults or children with special needs.

In any event, the harm to the Defendant is more than that.  The Defendant has a strong emotional attachment to the Property — perhaps stronger than the Court has seen in any other case.  She testified that her home (the Property) and herself "are just one."  In other words, the property is an integral part of her identity.  She "fell in love with" the Property.  She invested her entire life savings in the Property.  She performed manual labor to improve the Property, including painting the Property and making repairs.  The Property is the one place in the world where she feels safe, secure, and comfortable.  She wants desperately to stay in the Property and grow old there.  The Court finds that the foregoing is all the more compelling and understandable given the Defendant's life history: growing up in poverty in Eritrea; being forced into marriage in a foreign country at 13 years of age; suffering in an abusive relationship; immigrating to the United States; and working here for almost two decades to finally achieve the milestone of ownership of a modest house to call her own.

## V.     Legal Analysis.

The Court already entered the Summary Judgment Order and the SJ Judgment granting partial judgment in favor of the Chapter 7 Trustee and against the Defendant on the First, Third, Fourth, and Fifth Claims but denying summary judgment on the Sixth Claim.  (Subsequently, the Second Claim was dismissed.)  In the SJ Judgment, the Court ordered:

> The transfer of the real property located at 4648 S. Flanders Way, Centennial, Colorado (the "Property") evidenced by the Quitclaim Deed recorded with the Clerk and Recorder for Arapahoe County, Colorado on March 10, 2022 at Reception Number E2027864 (the "Transfer") is avoided pursuant to the Trustee's first claim for relief pursuant to 11 U.S.C. § 548(a)(1)(B) and the Trustee's third claim for relief under 11 U.S.C. § 544, which permits the Plaintiff to avoid the transfer pursuant Colo. Rev. Stat. § 38-8-105(1)(b). Pursuant to 11 U.S.C. § 550(a), the Trustee is awarded the Debtor's one-half interest in the Property.

Although the Defendant may have had legitimate defenses to the First, Third, Fourth, and Fifth Claims, the Defendant and her legal counsel failed to timely defend against the Summary Judgment Motion and also admitted all of the Requests for Admission posed by the Chapter 7 Trustee.

The Summary Judgment Order and SJ Judgment were not final because they did not dispose of all the causes of action asserted by the Chapter 7; however, the effect of

the Summary Judgment Order and SJ Judgment is plain.  "A Rule 56(d) order *granting* partial summary judgment from which no immediate appeal lies is *merged* into the final judgment and reviewable on appeal from the final judgment . . .  An order *granting* a judgment on certain issues is a judgment on those issues.  It forecloses further dispute on those issues at the trial stage."  *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1573 (Fed. Cir. 1986) (internal citations omitted, emphasis in original); *see also Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1284 n.4 (11th Cir. 2011) (citing *Glaros* passage with approval).

So, the sole remaining issue at this stage is adjudication of the Sixth Claim.  The Sixth Claim is based upon Section 363(h).  In the Complaint, the Chapter 7 Trustee asserts that he "is entitled to sell the Property free and clear of the Defendant's half interest in the Property."[66]

## A.    <u>The Applicable Statutes:  Sections 363(h), (i), and (j)</u>.

Section 363(h) allows a bankruptcy trustee to sell the estate's interest in real property along with a non-consenting co-owner's interest in such property — but only in limited circumstances.  Section 363(h) states the requirements:

> . . . the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if —
>
> (1)    partition in kind of such property among the estate and such co-owners is impracticable;
>
> (2)    the sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
>
> (3)    the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>
> (4)    such property is not used in the production, transmission, or distribution, for sale, of electrical energy or of natural or synthetic gas for heat, light, or power.

Non-consenting co-owners also are protected by other provisions of the Bankruptcy Code.  Section 363(i) imposes a right of first refusal and states:

---

[66]    Docket No. 1 at 59.

> Before the consummation of a sale of property to which
> subsection . . . (h) of this section applies . . . the debtor's
> spouse or a co-owner of the property, as the case may be,
> may purchase such property at the price at which such sale
> is to be consummated.

And Section 363(j) governs the distribution of proceeds for sales conducted under Section 363(h):

> After a sale of property to which subsection . . . (h) of this
> section applies, the trustee shall distribute to the debtor's
> spouse or co-owners of such property, as the case may be,
> and to the estate, the proceeds of such sale, less the costs
> and expenses, not including any compensation to the
> trustee, of such sale, according to the interests of such
> spouse or co-owners, and of the estate.

**B.   The Burden of Proof.**

The Chapter 7 Trustee has the ultimate burden to prove all of the Section 363(h) elements by a preponderance of the evidence. *Desmond v. Edrissi (In re Al-Idrisi)*, 634 B.R. 174, 183 (Bankr. D. Mass. 2021) ("The burden of proof is on the [Trustee] to establish these conditions by the preponderance of the evidence."). However, with respect to Section 363(h)(3), if the Chapter 7 Trustee demonstrates benefit to the estate through sale of the Property, the burden shifts to the Defendant to show her detriment. *Al-Idrisi*, 634 B.R. at 184; *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 795 (N.D. Ill. 2007) (recognizing shifting burden); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 382 (Bankr. N.D. Ill. 2005) (same); Maria A. Bove, *The Fate of Co-Owned Property Under Section 363(h): The Bankruptcy Code Can't Please All the People All the Time . . . Or Can It?*, 2000 Ann. Surv. of Bankr. L. 5 (Norton Annual Survey of Bankruptcy Law 2000) ("After the trustee has demonstrated some benefit to the estate, the burden shifts to the non-debtor to present evidence of detriment to him if the sale occurs."). And, then, if the Defendant shows her detriment, the Chapter 7 Trustee must prove that the benefit to the estate "outweighs" the detriment to the Defendant. *Al-Idrisi*, 634 B.R. at 184; *Ford v. Duggan (In re Duggan)*, 571 B.R. 1, 9 (Bankr. D.N.H. 2017); *Messer v. Chu (In re Gao)*, 560 B.R. 50, 67 (Bankr. E.D.N.Y. 2016); *Rhiel v. Cent. Mort. Co. (In re Kebe)*, 2014 WL 8276561, at *5 (Bankr. S.D. Ohio. Dec. 23, 2014).

Notwithstanding the respective burdens of proof, the Court's ultimate decision "to allow [or disallow] a Section 363(h) sale is an equitable judgment that is discretionary and fact driven." *Desmond v. Francis (In re Francis)*, 597 B.R. 195, 200 (Bankr. D. Mass. 2019); *Gao*, 560 B.R. at 67.

**C.   Analysis of Section 363(h) Elements.**

22

The preamble to Section 363(h), provides its general scope.  The statute applies when a trustee attempts to "sell both the estate's interest . . . and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common [or] joint tenant . . . ."  In this case, the Chapter 7 Trustee claims an interest in the Property and also recognizes that the Defendant has an interest in the same Property.  The Chapter 7 Trustee wants approval to sell both interests in the Property.

Pursuant to the SJ Judgment, the Court already avoided the Transfer of the Property and awarded to the Trustee "the Debtor's one-half interest in the Property."  The interest is in joint tenancy because the Debtor's interest was created in the Warranty Deed which provided that the Defendant and the Debtor would take title to the Property "not in tenancy in common but in joint tenancy . . . ."[67]  *See* COLO. REV. STAT. § 38-31-101(1) (". . . no conveyance . . . of real property to two or more natural persons shall create an estate in joint tenancy in real property unless, in the instrument conveying the real property . . . it is declared that the real property is conveyed . . . in joint tenancy or to such natural persons as joint tenants.").  According to Colorado law:

> The major distinguishing characteristic of a joint tenancy, as opposed to a tenancy in common, is the right of survivorship in each of the co-tenants.  Upon the death of one of the co-tenants in joint tenancy, the entire undivided interest of the deceased passes, by operation of law, to the surviving co-tenant.

*Bradley v. Mann*, 525 P.2d 492, 493 (Colo. App. 1974).

In joint tenancy, technically, "each joint tenant possesses the entire estate, rather than a fractional share."  *Taylor v. Canterbury*, 92 P.3d 961, 964 (Colo. 2004).  *See also Cohen v. Chernushin (In re Chernushin)*, 911 F.3d 1265, 1270 (10th Cir. 2018) ("Each joint tenant possesses an undivided interest in the whole property.").  So, to say (as the Court has) that the Defendant and the Debtor each have a "one-half interest" in the Property is a slight misnomer.  But, "Grantees under a joint tenancy deed are presumed to own equal shares in the property conveyed."  *Duston v. Duston*, 498 P.2d 1174, 1175 (Colo. App. 1972).  In any event, the joint tenancy interests of the Defendant and the Debtor were not severed by the Debtor's filing for bankruptcy.  *See* COLO. REV. STAT. § 38-31-101(5)(b) ("Filing a petition in bankruptcy by a joint tenant shall not sever a joint tenancy.").  Accordingly, the Chapter 7 Trustee has established that the proposed relief in the Sixth Claim falls within the general purview of Section 363(h).[68]

---

[67]   Ex. 9.

[68]   However, the Court would be remiss for not mentioning another point pertaining to timing. Section 363(h) applies when a Chapter 7 trustee desires to sell property in which the "debtor had, *at the time of the commencement of the case*, an undivided interest as a tenant in common [or] joint tenant . . . ." (emphasis added).  So, since the Debtor executed the Quitclaim Deed on March 5, 2022, and purported to transfer his joint tenancy interest to the Defendant, one might wonder whether the Debtor actually can be characterized as having a joint tenancy interest "*at the time of the commencement of the case*" which was October 21, 2022.  It is an intriguing question; however, it is an issue not raised by either

23

1.       __Partition in Kind of the Property Is Impracticable.__

The first Section 363(h) requirement is that "partition in kind of such property among the estate and such co-owners is impracticable."  In Colorado, partition is governed by Colo. Rev. Stat. § 38-28-101.  There are two types of partition: "partition in kind" and "partition by sale."  Jay Pickard, *Partition Comes of Age*, 50 Colo. Law. 32, 34 (Dec. 2021).

Partition in kind means to split or physically divide real property among two or more co-owners who each receive a proportionate share of the real property.  In Colorado, "partition in kind is favored over partition by sale, and the former should be ordered unless doing so would result in manifest prejudice to the parties.  Manifest prejudice may be shown when either (1) the physical characteristics of the land make it impracticable to divide into parts that correspond to the parties' respective interests; or (2) the value of the whole parcel is materially greater than the sum of its parts." *McNamara v. Mossman*, 230 P.3d 1286, 1288 (Colo. App. 2010) (partitioning 960 acres of land).

As the phrase suggests, "partition by sale" is a division of real property accomplished by a sale.  As part of the sale process, the proceeds are used to pay the costs of sale (including brokers' commissions) as well as taxes and liens.  Then, after

---

the Chapter 7 Trustee or the Defendant.  Instead, the Chapter 7 Trustee and the Debtor proceeded at the trial as if the Debtor had a joint tenancy interest as of the Petition Date.

The timing topic becomes muddled because a principal purpose of the Complaint was to avoid the Transfer of the Property as a fraudulent conveyance under Federal and State law.  *See* Compl. First, Third, Fourth, and Fifth Claims.  And, the Chapter 7 Trustee successfully obtained the Summary Judgment Order and SJ Judgment which avoided the Transfer altogether.  Under similar circumstances, numerous courts have determined that pre-petition transfers of property by debtors which are avoided post-petition in adversary proceedings still can count under Section 363(h) as satisfying the requirement that the "debtor had, at the time of the commencement of the case" a joint tenancy interest in real property.  *See Gao*, 560 B.R. 50 (authorizing Section 363(h) sale with respect to debtor's joint tenancy interest in residence debtor transferred to defendant pre-petition but which was avoided and recovered post-petition); *Phillips*, 379 B.R. at 795 ("[T]he transfer of the Debtor's one-half interest in the Burr Ridge Property from himself to Mercedes has been avoided [as a fraudulent transfer].  Thus, the Court finds that the Debtor's one-half interest . . . belongs to the Debtor's bankruptcy estate.  Section 363(h) applies to property that a trustee recovers under the Bankruptcy Code's avoiding powers."); *Grochocinski*, 320 B.R. at 382 (finding that Section 363(h) applies to property that a trustee recovers under the Bankruptcy Code's avoiding powers" and authorizing Section 363(h) sale of real property transfers avoided and recovered as fraudulent conveyances); *Hunter v. Levesque (In re McCoy)*, 92 B.R. 750 (Bankr. N.D. Ohio. 1988) (assuming Section 363(h) applies after fraudulent transfer avoided); *Behm v. Bell (In re Bell)*, 80 B.R. 104, 105 (M.D. Tenn. 1987); *Zoltanski v. Brown (In re Brown)*, 33 B.R. 219, 222-23 (N.D. Ohio. 1983); *Hawkins v. Lister (In re Lister)*, 2011 WL 10642780, at *9 (Bankr. E.D. Cal. Mar. 30, 2011) ("The trustee's power to sell co-owned property under Section 363(h) applies to property recovered through the trustee's avoiding powers and Section 550.").

Against the wealth of precedent, the Court has located no authority barring Section 363(h) sales of property avoided and recovered post-petition as fraudulent transfers.  Given the foregoing, and since neither the Chapter 7 Trustee nor the Defendant raised the issue, the Court concludes that the avoidance of the Transfer as a fraudulent conveyance and recovery of the Debtor's joint tenancy interest in the Property albeit post-petition still satisfies the timing requirement of the Section 363(h) preamble.

determining the respective interests of the joint tenants, the court engages in an equitable allocation of the remaining proceeds in which it takes into account the respective contributions of the joint tenants. *Martinez v. Martinez*, 638 P.2d 834, 836 (Colo. App. 1981) ("once the property has been divided [and sold], the court may then, to reach an equitable result, compute the contribution of each tenant and offset [such amounts] . . . ."). Accounting for differing contributions of joint tenants is critical to partition by sale under Colorado law. Section 363(h) is a type of "partition by sale" statute.

In any event, the Chapter 7 Trustee established, both through his testimony and that of the Defendant, that partition in kind of the Property is impracticable. After all, the Property is a personal residence and cannot be physically divided like unimproved land. The comedic trope of dividing a room with masking tape after an argument will not work in the real world for a permanent physical division of residential property. *See e.g.,* I LOVE LUCY: MEN ARE MESSY (CBS Season 1 Episode 8) (Lucy divides apartment in half with tape; Lucy gets kitchen while Ricky gets bathroom; partition does not work well).

A single-family home, almost by definition, cannot be partitioned in kind. According to the leading treatise:

> The overwhelming majority of reported cases discussing Section 363(h) involve single-family residences shared by the debtor and the debtor's spouse. In these cases, courts uniformly hold that there is no practicable way to partition the property.

Henry J. Somer, 3 COLLIER ON BANKRUPTCY ¶ 363.08[4][a] (LexisNexis 16th Ed. Supp. 2023). The cases so holding are legion. *See, e.g.*, *Bell v. McLemore*, 347 F. Supp. 3d 362, 368 (M.D. Tenn. 2018) ("Where property is a single family residence, there is no practicable manner of partition other than a sale and division of the proceeds."); *Pettie v. Brannon (In re Brannon)*, 584 B.R. 417, 424 (Bankr. N.D. Ga. 2018) (same); *Phillips*, 379 B.R. at 796 (same); *Grochocinski*, 320 B.R. at 382-83 (same); *Bakst v. Griffin (In re Griffin)*, 123 B.R. 933, 935-36 (Bankr. S.D. Fla. 1991) (same); *Neylon v. Addario (In re Addario)*, 53 B.R. 335, 338 (Bankr. D. Mass. 1985) (same). The Court is unaware of any contrary authority. So, the Chapter 7 Trustee met his burden to prove the Section 363(h)(1) requirement.

    **2.**    **Sale of an Undivided Interest in the Property Would Realize Significantly Less than Sale of the Property Free and Clear of the Interests of the Defendant.**

The second Section 363(h) requirement is that "the sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners."

The Chapter 7 Trustee testified that sale of the estate's undivided interest in the Property would realize significantly less for the Debtor's bankruptcy estate than the sale of the Property free of the interests of the Defendant. Indeed, the Trustee could not conceive of anyone buying an undivided joint tenancy interest in the Property. The Defendant's own testimony supported the foregoing. The Court finds the proposition that sale of the estate's undivided interest in the Property would realize significantly less for the Debtor's bankruptcy estate than the sale of the Property free of the interests of the Defendant is virtually self-evident.

Indeed, "[i]t is generally accepted that the sale of a bankruptcy estate's undivided interest will generate substantially less than the sale of the property free of each owner's interest because of the chilling effect that the sale of the undivided interest usually has on prospective purchasers of the property." *Maxwell v. Barounis (In re Swiontek)* 376 B.R. 851, 866 (Bankr. N.D. Ill. 2007); *see also Al-Idrisi*, 634 B.R. at 183 (same); *Brannon*, 584 B.R. at 424 (similar); *Yoppolo v. Schwenker (In re Ziegler)*, 396 B.R. 1, 4 (Bankr. N.D. Ohio. 2008) (same); Richard Levin and Henry J. Somer, 3 COLLIER ON BANKRUPTCY ¶ 363.08[4][b] (LexisNexis 16th Ed. Supp. 2023) ("In single-family residence cases, this condition [Section 363(h)(2)] is easily satisfied. Courts recognize that the co-owner's continued residence at the property will chill any interest in purchasing the debtor's interest alone."). The proposition is so obvious that many courts have taken judicial notice of it in the context of proposed Section 363(h) sales involving joint tenancy interests in residential real property. *See Phillips*, 379 B.R. at 796 (taking judicial notice of the Section 363(h)(2) "economic reality"); *Maxwell*, 376 B.R. at 866 (similar); *Grochocinski*, 320 B.R. at 383 (same); *Griffin,* 123 B.R. at 935-6 ("This Court takes judicial notice that a sale of the estate's undivided one-half interest would realize substantially less than a sale of the property free of the interest of the co-owner."); *Voiland v. Gillissie (In re Gillissie)*, 215 B.R. 370, 380 (Bankr. N.D. Ill. 1997) ("[I]t is generally accepted that sale of a bankruptcy estate's undivided one-half interest will generate substantially less than sale of the entire property interest free of each owner's interest because of the chilling effect that sale of such a limited interest has on prospective purchasers of the property, especially when the co-owner could continue to live on the property."); *Maiona v. Vassilowitch (In re Vassilowitch),* 72 B.R. 803, 808 (Bankr. D. Mass. 1987) (in the absence of testimony, "the Court takes judicial notice of the fact that the estate's undivided interest would realize significantly less for the estate than a sale free of Mrs. Vassilowitch's interest"). The Chapter 7 Trustee met his burden to prove the Section 363(h)(2) mandate.

26

3.   **The Benefit to the Estate of Sale of the Property Free and Clear of the Interests of the Defendant Does Not Outweigh the Detriment to the Defendant.**

The crux of this dispute is the third Section 363(h) requirement: "the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners." Analytically, Section 363(h)(3) requires that the Chapter 7 Trustee first prove "the benefit to the estate." Then, the burden shifts to the Defendant to show "detriment." Finally, the Chapter 7 Trustee bears the ultimate burden to establish that the benefit to the estate "outweighs" the detriment to the Defendant. This final exercise requires a kind of balancing.

a.   **The Benefit to the Estate from Sale of the Property.**

"The benefit to the estate usually consists of the proceeds the estate will realize as a result of the sale, which may be used to pay a debtor's creditors." *Hopkins v. Wright (In re Labbee)*, 550 B.R. 854, 859 (Bankr. D. Idaho 2016). In other words, Section 363(h) benefit generally is economic. The Chapter 7 Trustee proposes to start with the sales value of the Property: $600,000.00. Then, the Chapter 7 Trustee concedes that he would have to engage a real estate broker who would charge approximately 6% of the sales price (*i.e,* about $36,000.00). The Chapter 7 Trustee also acknowledges that there would be approximately $3,000.00 in additional closing costs for title insurance, recording fees, taxes, and the like. Per the unrebutted testimony, the value of the Property minus the anticipated real estate commission and closing costs yields $561,000.00. The Trustee admits that he would have to satisfy the lien based on the Replacement Deed of Trust (estimated at the face principal amount of $430,000.00)[69] prior to any closing. That leaves $131,000.

So far, the Court concurs with the Trustee's calculation as a matter of fact and law. But, then, the Chapter 7 Trustee asserts that the $131,000.00 in proceeds should be split evenly between the Chapter 7 Trustee and the Defendant: $65,500.00 each. If the Chapter 7 Trustee is right in being able to obtain an even split, then the Chapter 7 Trustee contends his $65,500.00 share would be available to pay administrative claimants (including the Chapter 7 Trustee as well as his legal counsel and accountant) with any surplus available to pay American Family Insurance at least in part (depending on the amount of allowed administrative expense claims). The Chapter 7 Trustee estimates his commission at $10,000.00 while his accountant is owed about $2,000.00 and attorneys' fees are estimated at $20,000.00 (at the high end). So, administrative expenses would total about $32,000.00. Then, a surplus of $33,500.00 would be available to nearly satisfy American Family Insurance's $34,675.96 Proof of Claim almost in full (*i.e.*, a 97% distribution to the only unsecured creditor). If the Chapter 7 Trustee is correct, payoff of the mortgage and use of the $65,500.00 in proceeds to pay

---

[69]   $430,000.00 is the original principal amount identified in the Replacement Deed of Trust dated March 5, 2022. Neither the Chapter 7 Trustee nor the Defendant provided evidence of the current outstanding balance. Accordingly, the Court utilizes $430,000.00 as the amount of the lien. During closing argument, counsel for the Chapter 7 Trustee made the same assumption.

administrative expenses, the Chapter 7 Trustee's commission, plus a 97% distribution to the sole general unsecured creditor plainly would be a "benefit to the estate." *See Gazes v. Roswick (In re Roswick)*, 231 B.R. 843, 860 (Bankr. S.D.N.Y. 1999) ("It is a benefit to the estate to pay secured creditors, administrative and priority unsecured claims from the proceeds of a sale of property pursuant to Section 363(h) . . . ."); *Gordon v. Pullen (In re Pullen)*, 2013 WL 6000568, at *3 (Bankr. N.D. Ga. Nov. 10, 2013) ("The concept of benefit to the estate includes benefit to administrative claimholders, secured claimholders, priority claimholders, as well as the general unsecureds.").

But, the Court has serious doubts about the Chapter 7 Trustee's methodology for calculating proceeds available to the bankruptcy estate. Section 363(j) governs the distribution of proceeds for sales conducted under Section 363(h):

> After a sale of property to which subsection . . . (h) of this section applies, the trustee shall distribute to the debtor's . . . co-owners of such property . . . and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation to the trustee, of such sale, *according to the interests of such . . . co-owners, and of the estate*.

(Emphasis added). What this means is that after the deductions for costs and expenses, the distribution of proceeds must be done "according to the [respective] interests" of the Chapter 7 Trustee and the Defendant. This principle implicates State law.

Per the most influential bankruptcy treatise, Section 363(j) "gives the court substantial discretion to order the distribution, subject to the rights of the parties *under applicable nonbankruptcy law, which determine their respective interests*." Henry J. Somer, 3 Collier on Bankruptcy ¶ 363.08[6][a] (LexisNexis 16th Ed. Supp. 2023) (emphasis added). The Court concurs. Under Section 541(a), a debtor's undivided interest in a joint tenancy is included in his bankruptcy estate, along with all of his other legal and equitable property interests. However, it is the province of State (rather than Federal) law to determine the nature and extent of a debtor's property interests. That is the teaching of *Butner v. United States,* 440 U.S. 48, 55 (1979). In *Butner*, the Supreme Court held that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

Following the letter and spirit of *Butner*, the Court finds two separate features of Colorado State law suggest that the Chapter 7 Trustee's equal split formula is wrong in the circumstances of this Adversary Proceeding.

*First*, the Chapter 7 Trustee's proposal does not acknowledge the important role of differing contributions made by joint owners of real property in the partition by sale calculus. The *Martinez* decision, 638 P.2d 834, is key. In *Martinez*, the parties stipulated that the remaining value of the property to be partitioned by sale was $75,000.00 and that the defendant had paid $19,966.97 for "payment for the land," taxes and assessments while the plaintiff had contributed only $2,593.64. Given the disparity in contributions, the appellate court determined that the remaining proceeds should have been split as follows:

!

> Here, the trial court should have begun with the stipulated value of $75,000, or $37,500 for each party, and then should have subtracted one-half of plaintiff's contribution, ($1,296.82), from defendant's share and added one-half of plaintiff's contribution ($1,296.82) to plaintiff's share. The court should then have subtracted one-half of defendant's contribution ($9,983.48), from plaintiff's share and added one-half of defendant's contribution ($9,983.48) to defendant's share. The result of such calculation is that, after the accounting, defendant's interest in the property is $46,186.66 and plaintiff's interest is $28,813.34 less the costs of the commissioner and other costs assessed against the plaintiff.

*Id*. at 837. In other words, contributions are central to deciding distribution of proceeds from a partition by sale of jointly owned real property. In *Martinez*, the defendant had contributed more, so the defendant was entitled (as his property interest) to a far greater share of the partition proceeds than the plaintiff.

According to *Martinez*, an equal split would be wrong in the context of this dispute. In this Adversary Proceeding, the respective contributions as between the Debtor and the Defendant are starkly different. The Debtor (whose interest the Chapter 7 Trustee seeks to monetize) contributed nothing at all toward the Property: no downpayment; no monthly mortgage payments; no payments of taxes or assessments; no money toward maintenance or repairs; and not even some other sort of sweat equity. The Debtor did nothing and does not even live in the Property. For years, the Debtor did not even know he was listed as a record owner. On the other hand, the Defendant made all the contributions toward the Property. The Court did not receive into evidence itemization of all the costs and expenses made by the Defendant. But, the Defendant did at least the following: (1) she paid the entire Downpayment for purchase of the Property ($15,841.00); (2) she made all of the monthly mortgage payments (approximately $2,500.00 per month) on the Property from October 2019 to the present (including after the Debtor filed for bankruptcy protection); and (3) she contributed "sweat equity" to the Property, painting the Property herself and making other repairs which added to the Property's value. At trial, the Defendant acknowledged that a few months of the monthly mortgage payments were deferred during the COVID pandemic in 2020. But, based on the evidence, the Court estimates that the Defendant made

29

about 46 monthly mortgage payments of about $2,500.00, for a total of about $115,000.00.  Coupled with the Downpayment, the Defendant contributed around $130,841.00.  She also paid the taxes and assessments.  However, the Court did not receive any specific evidence about such amounts.  And, again, the Debtor paid nothing.

Applying Colorado State partition by sale law and the *Martinez* formula, instead of the Chapter 7 Trustee's proposal to evenly split the $131,000.00 in proceeds (after payment of costs and the Replacement Deed of Trust), the Chapter 7 Trustee's split would be as follows:  (1) Start with half of the proceeds: $65,500.00; (2) Subtract "one-half of Defendant's contribution": $65,420.50 (one-half of $130,841.00); (3) Equals $79.50.  So, the Chapter 7 Trustee would get almost nothing.  On the other side, the Defendant's split should be: (1) Start with half of the proceeds: $65,500.00; (2) Add "one-half of Defendant's contribution": $65,420.50; (3) Equals $130,920.50.[70]  Under Colorado law, the objective is to reach an "equitable result" based on contributions.  *Id.* at 836.  The Court finds that equity suggests the Trustee should not be entitled to any of the proceeds.  *See also Lovald v. Tennyson (In re Wolk)*, 451 B.R. 468 (8th Cir. BAP 2011), *aff'd* 686 F. 3d 938 (8th Cir. 2012) (noting with approval that "[s]ince the undisputed evidence showed that all of the equity amount was attributable to the co-owner's financial input, the bankruptcy court determined [under South Dakota law] that all of the equity would accrue to her upon sale").  So, there may be no benefit to the estate from any Section 363(h) sale.  And, in any event, the disparity in respective contributions also may be considered as the Court analyzes detriment to the Defendant pursuant to Section 363(h)(3).

There is a *second* Colorado law issue that seems completely lost in how the Chapter 7 Trustee calculates benefit: the Colorado homestead exemption.  What happened to it?  The Chapter 7 Trustee just seems to have written it out of his equation entirely in order to capture more proceeds.

Article XVIII of the Colorado Constitution provides: "The general assembly shall pass liberal homestead and exemption laws."  The Colorado legislature followed through on the Constitutional mandate to protect homesteads.  The current version of the Colorado homestead exemption states:

> Every homestead in the state is exempt from execution and attachment arising from any debt, contract, or civil obligation not exceeding in actual cash value in excess of any liens or encumbrances on the homesteaded property in existence at the time of any levy of execution thereon:

---

[70]   Arguably, the Defendant's contributions of mortgage payments should be considered only with respect to the principal portion of such payments.  The Court does not have evidence of principal reduction.  But, no matter how one does the math, the point is that under Colorado State law, in a partition the Defendant would be entitled to all or the lion's share of proceeds after payment of costs of sale.

> (a) The sum of two hundred fifty thousand dollars if the homestead is occupied as a home by an owner or an owner's family . . . .

COLO. STAT. REV. § 38-41-201(1)(a).  There can be no doubt that the Property constitutes a protected homestead.  After all, the Property is real estate (a single-family residence) and the Defendant lives in the home.  *See In re Romero*, 533 B.R. 807, 816 (Bankr. D. Colo. 2015) (construing the term "homestead" as tied to real property).[71]

During closing argument, the Chapter 7 Trustee's counsel referred the Court to an important decision:  *Pruitt v. Wilson (In re Pruitt)*, 829 F.2d 1002 (10th Cir. 1987).  The *Pruitt* case is a key decision and binding appellate precedent explaining how Section 363(h) sales proceeds should be distributed given the homestead exemption.  In discussing the Colorado homestead exemption, the appellate court noted:[72]

> [L]ooking to the Colorado law to find a definition of the homestead exemption, we find it has always been regarded as an exemption which attached to the realty itself and not to a debtor personally.  That fact is initially evident from the statute itself, which states "Every homestead . . . occupied as a home . . . shall be exempt from execution and attachment . . . ."  1973 C.R.S. § 38–41–201.  It cannot be convincingly argued that this language creates a *personal* right, for how can a personal right be "occupied as a home"?  The posit of the question suffices as its answer.
>
> Moreover, Colorado courts have always regarded the homestead as a property right, the purpose of which is to preserve a right of occupancy, *In re Wallace's Estate,* 125 Colo. 584, 246 P.2d 894 (1952), and to preserve family habitation, *Weare v. Johnson,* 20 Colo. 363, 38 P. 374 (1894).  Indeed, in *Wright v. Whittick,* 18 Colo. 54, 31 P. 490, 491 (1892), the Colorado Supreme Court stated:

---

[71] The Debtor did not assert a homestead exemption in the Property in his bankruptcy case.  After all, he did not live at the Property, and he executed the Quitclaim Deed purporting to transfer his joint interest in the Property well before his bankruptcy filing.  However, the homestead exemption attaches to the Property.  And, the Defendant does live at the Property.  As a non-debtor who believed that she was the sole owner of the Property, she had no occasion to assert a homestead exemption in the debtor's bankruptcy case.

[72] *Pruitt* is a short *per curiam* decision wherein the Tenth Circuit held:  "For the reasons stated in the district court's opinion attached as an Appendix hereto, we AFFIRM."  *Pruitt*, 829 F.2d at 1003.  United States District Judge John P. Moore (who later joined the Tenth Circuit) authored the attached district court opinion.  For ease of reference, when this Court cites to the Tenth Circuit's *Pruitt* decision, the Court includes the attached district court opinion and makes no distinction between the two.

> The homestead exemption act extends certain protection *to the premises* set apart by the owner as a homestead . . . .  It protects [the premises] against proceedings by execution and attachment . . . .

*Id*. at 1004-05.[73]

So, based on *Pruitt* and Colorado law, the $250,000.00 homestead exemption attached to the Property (because that is the Defendant's home).  *See also Robinson v. DePinto*, 44 B.R. 292 293-4 (D. Colo. 1984) (citing *Pruitt* for proposition that Colorado homestead exemption attaches to real property); *In re Khan*, 2015 WL 739854, at *3 (Bankr. D. Colo. Feb. 19, 2015) (same).

What happens when a Chapter 7 Trustee wants to conduct a sale of homestead property under Section 363(h)?  *Pruitt* provides the answer.

> Kay Wilson, the [Chapter 7] Trustee, moved the bankruptcy court pursuant to 11 U.S.C. § 363(h) for permission to sell the property.  The bankruptcy court issued an order granting the trustee's motion to sell the property.  The bankruptcy court ordered the proceeds of the sale to be applied as follows:
>
> > a) $8,000 to the mortgage,
> >
> > b) $20,000 for the homestead exemption to the debtor and his wife as joint tenants,
> >
> > c) $3,000 for the real estate commission plus miscellaneous expenses of sale, and
> >
> > d) one-half of the remainder to the debtor's wife and the other one-half to the trustee for the benefit of the debtor's creditors.

*Pruitt*, 829 F.2d at 1003.  The foregoing distribution calculation was affirmed by both the District Court and the Tenth Circuit.  The main point for present purposes is to note that the homestead exemption (which then was much smaller) was applied *before* the proceeds were evenly split between the Chapter 7 trustee and the co-owner.

---

[73]     Issues concerning the Colorado homestead exemption did not feature prominently in the trial of the Adversary Proceeding.  But, during closing argument, counsel for the Chapter 7 Trustee referred the Court to *Pruitt*, 829 F.2d 1002, as binding appellate precedent on the issue of distribution calculations. And, counsel for the Defendant also referenced a case that involved the homestead exemption in a Section 363(h) sale.  *In re Levenhar*, 24 B.R. 331 (Bankr. E.D.N.Y. 1982).

During closing argument, counsel for the Chapter 7 Trustee endorsed the *Pruitt* distribution waterfall but then stated that no subtractions for the homestead exemption should be made and "she [the Defendant] doesn't get to take the homestead exemption to the detriment of the bankruptcy estate." But why not? The homestead exemption was applied in *Pruitt* before the Chapter 7 trustee received any proceeds.

Colorado bankruptcy decisions before and after *Pruitt* are in accord. For example, in *In re Lambert*, 34 B.R. 41 (Bankruptcy D. Colo. 1983), the bankruptcy court discussed a potential Section 363(h) sale.

> The Debtor and Evelyn Lambert next argue that each, as a joint tenant of the property, is personally entitled to the $20,000.00 homestead exemptions provided for in Sec. 38-41-201, C.R.S., and thus, after applying these claimed homesteads and the costs of sale of the property, there is no value to the estate. The law in this district is well settled that there is only one homestead exemption per a specific piece of real property. . . . Thus, the homestead exemption amount of $20,000.00 is subtracted from the net proceeds of sale *before* any determination is made with respect to the equity of any specific joint tenant. By performing the calculations in this manner, under either the Debtor's or the Trustee's assertion of value, it is clear that there is substantial equity in the estate in this case.

*Id*. at 43-44 (emphasis in original, internal citations omitted).

Similarly, more than two decades later, in *Sender v. Caravana (In re Sessions)*, 2009 WL 5943244, at *5 (Bankr. D. Colo. Nov. 2, 2009), the bankruptcy court found "that the $90,000 homestead exemption is applicable [to a Section 363(h) sale motion].") The *Sessions* court adopted the Chapter 7 trustee's calculation: "Using a sale price of $217,898, and considering costs of sale and a $90,000 homestead exemption, the Trustee calculates that the estate would receive $22,964.82 for the Debtor's [20%] interest." *Id*. at *2. The Section 363(h) sale was approved, but the court directed the Chapter 7 trustee "to issue a $90,000 check [for the homestead exemption] payable jointly to the five co-owners, who may either reach agreement as distribution or pursue litigation in another court [to split the homestead exemption amount]." *Id*. at *5.

More recently, in *In re Khan*, 2015 WL 739854 (Bankr. D. Colo. Feb. 19, 2015), the court was called upon (in the context of Chapter 13 confirmation proceedings) to calculate the proceeds which would be available in a hypothetical Chapter 7 liquidation of property under Section 363(h). The *Khan* court determined that the "appropriate calculation" was:

| | |
|---|---|
| Stipulated Value of Property: | $430,000.00 |
| Less Stipulated 8% Costs of Sale: | -  34,400.00 |
| | $395,600.00 |
| Less Mortgage Payoff: | - 283,773.00 |
| | $111,827.00 |
| Less Claimed Homestead Exemption: | -60,000.00 |
| Proceeds to Be Divided Between Co-Owners: | $  51,827.00 |

*Id.* at *3.  For more clarity, the *Khan* court added:

> Thus, deducting the full $60,000.00 homestead exemption
> from the proceeds of the sale following the payment of the
> costs of sale and the mortgage lien results in proceeds of
> $51,827.00.  Assuming Khan [the debtor] is entitled to one-
> half of such proceeds, dividing $51,827.00 by two equals
> $25,913.50.  Thus, a Chapter 7 liquidation [under Section
> 363(h)] would result in potential distribution of approximately
> $25,913.50 to unsecured creditors . . . .

*Id*.  And, in its decision the *Khan* court noted that the allocation of the claimed
homestead as between the debtor and the co-owner was "irrelevant."  *Id*.  Considering
the foregoing legal authority (*Pruitt* and its progeny), in this Adversary Proceeding, there
would be no proceeds available to the Chapter 7 Trustee after subtraction of the costs
and the Replacement Deed of Trust because the $250,000.00 homestead exemption is
*higher* than the $131,000.00 remainder.

Based on this Court's assessment of both the respective contributions of the
Debtor ($0.00) and the Defendant ($130,841.00) to the Property as well as the
application of the homestead exemption, the Court finds that the Chapter 7 Trustee has
not met his burden to prove that the bankruptcy estate would be likely to recover
anything in a Section 363(h) sale of the Property.  Without benefit, the Section 363(h)
Sixth Claim fails.

### b.     The Detriment to the Defendant from Sale of the Property.

Even though the Chapter 7 Trustee has not established "benefit to the estate" of
a proposed Section 363(h) sale of the Property, for completeness, the Court still
considers "detriment" to the Defendant.  "In contrast [to estate benefit], the detriment to
the non-debtor co-owner includes more than simple financial prejudice."  *Labbee*, 550

B.R. at 859.  "Detriment to a co-owner "include[s] not just economic harm, but also psychological, emotional, and physical harm."  *Al-Idrisi*, 634 B.R. at 185.

The seminal appellate decision on Section 363(h)(3) detriment is *Community Nat'l Bank and Tr. Co. of N.Y. v. Persky (In re Persky)*, 893 F.2d 15 (2d Cir. 1989).  According to the appellate panel:

> [I]t is obvious that Congress was acutely concerned with the potential harshness that § 363(h) might create. *See* 1978 U.S. Code Cong. & Admin. News at 6137–38.  Hence, it seems evident that in valuing detriment to the co-owner, § 363(h)'s balancing test should include non-economic factors.  We recognize that the statute does not spell this out in so many words, yet it is implicit in the inclusion of the balancing test and is borne out by the legislative history. *See In re McCoy,* 92 B.R. 750, 752 (Bkrtcy. N.D. Ohio 1988); *In re Coombs,* 86 B.R. 314, 318 (Bkrtcy. D. Mass. 1988); *In re Spain,* 85 B.R. 874, 878 (Bkrtcy. N.D. Ala. 1988); *In re Ray,* 73 B.R. 544, 549 (Bkrtcy. M.D. Ga.1987).
>
> In weighing detriment to the non-debtor spouses a number of variables must be considered when valuing their survivorship interests as well as their present possessory interests: for example, actuarial calculations of the life expectancies of the spouses, respective contributions to the purchase price of the home, tax exemptions available on the property, prospects for acquiring a new home, special physical or mental handicaps, and minor children living at home. *Cf. U.S. v. Rodgers,* 461 U.S. 677, 704–05, (1983). In another statutory setting the Supreme Court summed up the dilemma the present statute poses stating that "we are not blind to the fact that in practical terms financial compensation may not always be a completely adequate substitute for a roof over one's head."  *Rodgers,* 461 U.S. at 703–04.

The *Persky* holding (*i.e.*, that Section 363(h)(3) detriment to the co-owner is more inclusive than just economic harm) is the law across the nation.  *See Lovald v. Tennyson (In re Wolk)*, 686 F.3d 938, 939 (8th Cir. 2012) [hereinafter *Wolk II*] ("In evaluating the detriment to the co-owner, noneconomic factors can be considered."); *Al-Idrisi*, 634 B.R. at 185 (considering noneconomic harms); *Griffin*, 123 B.R. at 936 (considering emotional detriment); *Kebe*, 2014 WL 8276561, at *13 (considering noneconomic factors).  In this Adversary Proceeding, the Defendant has asserted that she would suffer both economic and non-economic detriment from a Section 363(h) sale of the Property.

In the Court's view, the most important *Persky* factor which must be considered in the unique circumstances of this dispute is the respective contributions of the Debtor and the Defendant to the Property.  To reiterate, the Defendant made the entire Downpayment for the Property when it was purchased in October 2019.  The Debtor paid nothing.  The Defendant made all the monthly mortgage payments for the Property during the last four years and three months (except for a short COVID forbearance).  The Debtor paid nothing.  The Defendant paid for maintenance and repairs to the Property, and contributed her labor.  The Debtor paid nothing and contributed nothing.  The Defendant paid taxes, assessments, and insurance for the Property.  The Debtor paid nothing.  The Defendant contributed about $130,841.00 (through the Downpayment and monthly mortgage payments alone).  The Debtor contributed nothing.  And, the Chapter 7 Trustee also has contributed nothing during the bankruptcy case as the Defendant was reducing the mortgage balance on the Replacement Deed of Trust.

It would be a significant detriment (primarily economic but also emotional) to the Defendant to allow the Trustee to strip the equity from the Property by forcing a sale of a single-family residence in which the non-debtor co-owner paid everything whilst the Debtor paid nothing.  For example, in *Wolk II*, the Eighth Circuit appellate panel affirmed the denial of a Section 363(h) sale motion where the bankruptcy court "found that all of the equity in the home was attributable to [the co-owner's] financial contributions, that the equity in the home would have accrued to her under South Dakota law, that [the co-owner] would suffer emotional hardship from a sale, and that the bankruptcy estate would not substantially benefit from a sale of the home."  *Wolk II*, 686 F.3d at 939.  Courts regularly deny Section 363(h) non-consensual forced sales of single-family homes in circumstances where the non-debtor co-owner made all the contributions toward a property and the debtor paid nothing — because of the obvious and severe economic and emotional detriment to the non-debtor co-owner.  *Berland v. Gauthreaux (In re Gauthreaux)*, 206 B.R. 502, 506 (Bankr. N.D. Ill. 1997)  (Section 363(h) sale denied where non-debtor co-owner "was the sole contributor to purchase of the property" and where [n]o monies where paid [by debtor] toward the purchase price, acquisition, or maintenance of the property"); *Griffin*, 123 B.R. at 934 (Section 363(h) sale denied where non-debtor co-owner made "[a]ll mortgage payments and improvements" and "debtor has not resided in the property"); *Kebe*, 2014 WL 8276561, at *7 (Section 363(h) sale denied where non-debtor co-owner was an African immigrant who resided in single-family residence and made "all payments that have been made on the Note").

Economically, the Court recognizes that the Chapter 7 Trustee's position (if accepted) would still leave the Defendant with about $65,500.00.  However, the financial detriment is that the Chapter 7 Trustee effectively would be taking the majority of the equity in the Property (through costs of sale and distribution to the Chapter 7 Trustee) to pay creditors of a Debtor who never contributed anything to the Property.  And, the Defendant would lose any tax exemptions for home ownership.  Also, as set forth below, such equity stripping would damage the Defendant emotionally.

36

In *Persky*, the appellate court also indicated that "prospects for acquiring a new home" must be considered as another economic factor.  Recall that the Debtor lives in the Property with her son.  The Debtor never lived in the Property (except for a short period after it was purchased in 2019).  The Property is the real "roof over [her] head."  *Rodgers,* 461 U.S. at 703-04.  And, if the court granted the Sixth Claim, the Defendant would lose the roof.  The Defendant has nowhere else to go.  She earns a very low income through her trucking logistics business (New Oslo Logistics) which she operates out of the Property.  She also takes care of a child with special needs on the weekends at the Property.  Occasionally, she rents out the Property on AirBNB.  All of her income is derived from use of the Property.  And even then, she just barely makes enough to pay the mortgage on the Property and to survive.  If the Property is sold under Section 363(h), the Defendant could not afford anything comparable to the Property because real property prices have increased dramatically in recent years and mortgage rates have skyrocketed.  The Defendant's mortgage interest rate under the Replacement Deed of Trust is 3.5%.  But, the current rate for a 30-year fixed mortgage is 7.29%.  So, the Debtor could not afford a new mortgage (even at the same principal amount).  And, the Debtor has no funds with which to exercise the first right of refusal under Section 363(i).   Even assuming that the Court were willing to disregard Colorado law and the waterfall payment scheme set forth in *Pruitt* such that the Debtor would receive $65,500 from a Section 363(h) sale, that is not enough for the Debtor to buy a new home at higher prices and with much higher interest rates.  While the Court doubts the Defendant's testimony that she will be rendered "homeless" in the sense of being forced to live unsheltered on the street, the Court assesses that the most likely scenario is that the Defendant would be forced out of homeownership entirely and would have to revert to renting an apartment at a payment similar to or even greater than her current mortgage.  Such result would "diminish[] the quality of [her] life most seriously."  *Gauthreaux,* 206 B.R. at 507.  *See also McCoy*, 92 B.R. at 752 (considering effect of displacement on co-owner); *Brannon*, 584 B.R. at 424 ("The detriment to a co-owner may be significant where a sale would displace the co-owner from her residence or otherwise result in serious hardship.").  It would destroy the fruits of her decades of effort to achieve home ownership.

In addition to the foregoing detriments, which are primarily economic, the Court also considers non-economic detriment.  The Defendant has worked hard for decades to earn enough money to buy the Property.  She put everything she has into it.  To have it taken away to pay her father's sole creditor (a large insurance company) would be emotionally devastating.  *Kebe*, 2014 WL 8276561, at *14 ("By comparison, the co-owner, who was the only one who had made mortgage note payments, would suffer psychological harm . . . .").  And, the Defendant has a strong emotional attachment to the Property — perhaps stronger than the Court has seen in any other case.  She testified that her home (the Property) and herself "are just one."  In other words, the property is an integral part of her identity in life.  If the Property is sold, she would lose the one place in the world where she feels safe, secure, and comfortable after a lifetime of struggle.

### c.   The Chapter 7 Did Not Prove that the Benefit to the Estate Outweighs the Detriment to the Defendant.

Section 363(h) mandates a sort of balancing between benefit and detriment.  It is "an equitable judgment that is discretionary and fact driven."  *Francis*, 597 B.R. at 200;; *Gao*, 560 B.R. at 67. *See also Sessions*, 2009 WL 5943244, at *2 ("The balancing of benefit to the estate versus detriment to co-owners is a fact-sensitive analysis that is decided on a case by case basis."); *Duggan*, 571 B.R. at 10 (same).  It can be difficult to balance economic benefits against non-economic detriments.

However, in this Adversary Proceeding, the Chapter 7 Trustee did not meet his burden to prove the benefit to the estate of a Section 363(h) sale.  As set forth above, given that the Defendant made all contributions toward the Property, and that it is her homestead, the Chapter 7 Trustee would not receive anything in a Section 363(h) sale.  Furthermore, even if the Chapter 7 Trustee were able to realize the $65,500.00 he claims the bankruptcy estate would receive in a Section 363(h) sale, the Court assesses, in its judgment and discretion, that the economic and non-economic detriments which would be suffered by the Defendant outweighs any such benefits for the bankruptcy estate.  *See Wolk II*, 686 F.3d at 939-40; *Gauthreaux*, 206 B.R. at 506; *Griffin*, 123 B.R. at 937; *Kebe*, 2014 WL 8276561.  Accordingly, the Chapter 7 Trustee failed the Section 363(h)(3) requirement and the Sixth Claim fails.

### 4.   The Property Is Not Used in the Production of Electricity or Gas.

The fourth Section 363(h) requirement is that "such property is not used in the production, transmission, or distribution, for sale, of electrical energy or of natural or synthetic gas for heat, light, or power."  Congress "excepted jointly owned utility generation assets from Section 363(h)" in order to "protect public utilities from being deprived of power sources as a result of the bankruptcy of a co-owner."  Richard Levin and Henry J. Somer, 3 COLLIER ON BANKRUPTCY ¶ 363.08[4][d] (LexisNexis 16th Ed. Supp. 2023) (citing Congressional Report).

In her Answer, the Defendant refused to concede the Chapter 7 Trustee's allegation that "the Property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power."[74]  Instead, the Defendant asserted that such simple factual allegation "contains a legal argument to which no response is required."[75]  The Defendant's position is wrong.  Factually, the Property is not an electrical power plant; and it is not a natural gas production facility either.  Instead, as the Defendant herself testified at trial, the Property consists of a single-family residence located in Aurora, Colorado, in which the Defendant resides.  And, the Defendant also admitted as much in Fact No. 8 from the Order Establishing Facts.  The Chapter 7 Trustee easily met his burden to prove the Section 363(h)(4) mandate.

---

[74]   Docket No. 1 ¶ 58; Docket No. 12 ¶ 58.
[75]   *Id*.

## VI.    __Final Conclusion__.

For the reasons set forth above, the Court rules against the Chapter 7 Trustee on the Sixth Claim.  Judgment shall enter in favor of the Defendant and against the Chapter 7 Trustee dismissing the Sixth Claim.  The SJ Judgment (in which the Court entered Judgment in favor of the Chapter 7 Trustee and against the Defendant on the First, Third, Fourth, and Fifth Claims) shall merge into the Court's Judgment on the Sixth Claim, which therefore completes adjudication of all claims and defenses asserted in this Adversary Proceeding.

DATED this 18th day of January, 2024.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge